## Lawrence Trust (No. 1)

*Edgar Downey*, for accountant.

*Fred J. Wiest, Jr.*, for Gertrude A. Lawrence Estate.

GANGLOFF, P. J., December 24, 1951.—. . . The open question is whether the real estate income deficit is to be charged against the income of the trust generally, against the principal generally, or against the real estate principal exclusively. It is quite apparent that there was but one trust created for Gertrude A. Lawrence. The paragraph of the will wherein the trust is

created clearly combines the personal estate and the real estate into one trust thus: "to hold the said personal property and real estate and from the net income derived therefrom to pay the same to my sister, Gertrude A. Lawrence." There can be no doubt that net income "therefrom" means net income from the entire trust estate viewed as a whole.

The disbursements of real estate income were for taxes almost entirely, only $10 being for repairs and $12.50 for trustee's commission on income. Before the effective date of the Principal and Income Act of July 3, 1947, P. L. 1283 (the 1945 Act was repealed), a life tenant, except where the instrument creating the trust provided otherwise, was required to pay upkeep charges, such as taxes and repairs: McDannel et al. v. Weddige, 79 Pa. Superior Ct. 494; Gibson Estate, 153 Pa. Superior Ct. 413; Atkins Estate, 35 D. & C. 579; but equitable principles were applied in certain cases: Levy's Estate, 333 Pa. 440; Crozer Estate, 346 Pa. 446. The rule now is to be found in section 11 (1) of the Principal and Income Act, supra, which provides:

"All ordinary expenses and charges incurred in connection with the trust estate or with its administration and management, shall be paid out of income, but such expenses, where incurred in disposing of or as carrying charges on unproductive estate shall be paid out of principal, and where incurred in disposing of, or as carrying charges on under-productive estate, shall be paid out of principal to the extent that the income from the property shall not be equal to such expenses."

It is because testatrix gave the real estate portion of her remainder estate to certain individuals and the personalty portion thereof to these same individuals and others that the question of how the real estate income deficit is to be disposed of becomes a matter

for specific consideration and solution. Bearing upon this question is the fact, already pointed out, that the trust in this case was not to be administered as two separate trusts, one to consist of personalty and the other to consist of real estate; on the contrary the personalty and real estate were combined into one trust to be administered as a whole and the net income from the whole was to be paid to the life tenant. It was only where distribution was to be made upon the death of life tenant that testatrix actually made the distinction between personalty and real estate a matter of significance. However, that distinction relates to distribution only and not to administration of the trust estate for life tenant.

Certainly "ordinary expenses and charges," as used in the above-quoted section 11(1) of the Principal and Income Act of 1947, include taxes, necessary repairs and trustee's commission on income. Trustee's commissions on principal are covered by section 11(2) of the same act. In the present estate the deficit was incurred "as carrying charges on underproductive estate" and not "unproductive estate." Such being the fact, the deficit "shall be paid out of principal to the extent that the income from the property shall not be equal to such expenses." We are faced with a problem of semantics. The word "estate" as first used in section 11(1) undoubtedly means the entire trust corpus, personalty and real estate. The next time that word is used the meaning seems to be limited to part only of the trust corpus, the unproductive part, notwithstanding there could be such a thing as a trust estate entirely unproductive. The third and last time that word is used (the underproductive estate) the meaning appears to be the same as when used the second time. That such is the legislative intent finds support in the last part of the section. Here the word property used in the phrase "income from the property" undoubtedly

means that part of the trust corpus which is "underproductive" and therefore synonymous with "underproductive estate".

Having thus determined that "underproductive estate" means, in the present case, part of the trust corpus, we come to the application of the mandate of the Principal and Income Act of 1947, supra, that the deficit resulting from excess of expenses over income "from the property" shall be paid "out of principal". This word principal appears twice in section 11(1) of the act. In each instance the word seems to connote principal of the whole trust estate rather than principal of the unproductive or underproductive estate. Had the legislative intent been to limit principal, as used in the act, to that of the unproductive or underproductive property appropriate language to indicate such intent would have been included. Or, stated another way, had the legislative intent been to limit principal as just mentioned that intent would have been expressed as "paid out of principal of the unproductive (or underproductive) estate".

It should be noted here that notwithstanding the real estate was converted into cash we are not here concerned with the rule in salvage operations; the latter procedure now applies only to an interest bearing obligation. See section 10(1) of the Principal and Income Act, supra.

In view of what has been said above we conclude that the deficit in real estate income of the trust must be charged to principal of the trust estate as a whole. Since personalty principal and real estate principal are distributable in different proportions and not to the same individuals we must, in the application of equitable principles, prorate the deficit between $30,779.10 personalty principal and $6,308.19 real estate principal or $1,416.44 against the former and $290.30 against the latter.